PRESIDING JUSTICE HARRIS delivered the judgment of the court, with opinion.
*708 *526 ¶ 1 Plaintiffs, George R. and Irene A. Flynn, filed a complaint against defendant, the Town of Normal (Normal), alleging Normal's negligent and willful and wanton misconduct caused a motor vehicle collision, which resulted in serious personal injury to George, including the amputation of both of his legs, and loss of consortium to Irene. The trial court granted summary judgment in Normal's favor and plaintiffs appeal. We affirm in part, reverse in part, and remand for further proceedings.
¶ 2 I. BACKGROUND
¶ 3 On October 17, 2012, at approximately 5 p.m., George was involved in a motor vehicle accident on a two-lane historic bridge in Normal, Illinois. The bridge was known as the "Camelback Bridge" due to its distinctive "humped configuration." It was originally built around 1871, and in 2001, it was reconstructed. Normal was granted federal funding for the bridge reconstruction and the Illinois Department of Transportation (IDOT) administered the funds. Prior to the reconstruction, Normal was required to submit proposed plans for the bridge to IDOT and the Illinois State Historic Preservation Office for review and approval. During the reconstruction, the bridge was widened, and its vertical crest was lowered by several inches.
¶ 4 On the date of the accident, George was traveling eastbound over the crest of the bridge at approximately 25 miles per hour when he observed a vehicle driven by Jill M. Laird stopped in traffic ahead of him. George attempted to stop his vehicle but was unable to do so and struck the rear of Laird's vehicle. He then exited his vehicle, spoke with Laird, and walked between Laird's vehicle and his own. As George was between the two automobiles, a vehicle driven by Dr. Smita Amit Vyas traveled over the crest of the bridge in the eastbound lane and struck George's vehicle. George's vehicle was propelled forward and struck George, pinning him between the vehicles and, ultimately, resulting in the amputation of his legs.
¶ 5 In November 2012, plaintiffs filed a complaint against Vyas, alleging negligence and loss of consortium. In October 2013, they filed a 15-count amended complaint, naming Vyas, Normal, Normal Township, and the county of McLean as defendants. The record reflects plaintiffs' claims against Vyas were dismissed pursuant to a settlement agreement and their claims against Normal Township and the county of McLean were dismissed without prejudice on plaintiffs' own motion.
¶ 6 Relevant to this appeal, plaintiffs raised claims of negligence (count III), willful and wanton misconduct (count IV), and loss of consortium (counts V and VI) against Normal. Plaintiffs asserted Normal "owned, operated, managed, maintained[,] and controlled" the Camelback Bridge. Relative to their negligence claim, plaintiffs asserted that Normal was negligent in the following ways:
"a. Owned, operated, managed, maintained[,] and controlled the bridge and adjacent roadway with an excessive and unsafe crest obscuring vision of approaching vehicles to vehicles on the bridge and beyond in an unsafe proximity to the crest;
b. Posted, caused[,] and/or allowed an excessive speed limit for the bridge; [and]
c. Owned, operated, managed, maintained[,] and controlled the bridge and/or adjacent roadway with an unsafe and improper road surface relative to the coefficient of friction."
*709 *527 Plaintiffs maintained Normal's negligent acts or omissions proximately caused George's injuries.
¶ 7 In alleging willful and wanton misconduct by Normal, plaintiffs reasserted that Normal owned, operated, managed, maintained, and controlled the Camelback Bridge. They further alleged that the bridge was "extremely dangerous and unsafe for motorists" due to a combination of the "severe" crest of the bridge that obstructed the sight line of approaching motorists, the speed limit of the bridge approach, a road surface that was too slick, and the lack of any warning regarding the dangers posed by the bridge. According to plaintiffs, "the speed set for vehicles approaching the bridge increased the danger of collisions with vehicles on the bridge." They alleged Normal knew that the bridge was unsafe and motorists would not realize its dangers but allowed the unsafe conditions to remain, exhibiting "a course of conduct of utter indifference and conscious disregard for the safety of motorists using the Camelback Bridge and its approaches." Additionally, plaintiffs alleged George's injuries were proximately caused by Normal's willful and wanton acts, which consisted of the following:
"a. Refused to cause or allow the bridge crest to be modified to a safe elevation;
b. Refused to cause or allow the speed limit at and around the bridge to be reduced;
c. Refused to cause or allow the bridge to be resurfaced with [a] proper and safe surface;
d. Refused to close the bridge to vehicular traffic;
e. Refused to warn motorists of the above unreasonably dangerous conditions."
Plaintiffs reiterated the allegations raised in connection with their negligence and willful and wanton misconduct claims against Normal in their counts alleging loss of consortium to Irene.
¶ 8 In February 2016, Normal filed a motion for summary judgment. It maintained, in part, that (1) plaintiffs' action was barred by Illinois's 10-year construction statute of repose ( 735 ILCS 5/13-214(b) (West 2012) ), (2) it owed no duty of care to George because he was not an intended and permitted user of the roadway at the time he was injured as set forth in section 3102(a) of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) ( 745 ILCS 10/3-102(a) (West 2012) ), and (3) its conduct did not proximately cause George's injuries.
¶ 9 Normal filed a statement of facts in support of its motion along with numerous attachments. The attachments included depositions from the individuals involved in the October 2012 accident and various Normal employees, a police report and photographs from the October 2012 accident, documents pertaining to the bridge reconstruction, and portions of the Normal Municipal Code.
¶ 10 The record reflects that, during his deposition, George testified he was familiar with the Camelback Bridge, having traveled across it "with some degree of frequency" when going to and from his office in downtown Bloomington, Illinois. On the day of the accident, it was damp outside with light rain. George stated he traveled in an easterly direction over the bridge. As he traveled over the bridge's crest, he saw Laird's vehicle stopped in his lane of travel. He also noticed that there was a line of vehicles "all the way up to the stop sign" at the upcoming intersection. George testified he "slammed on [his] brakes" but his vehicle slid forward rather than stop and he collided with Laird's stopped vehicle.
*710 *528 He recalled that he put his vehicle in park and hurriedly exited his vehicle. George stated the collision "made a pretty good noise" and, because he was concerned for the welfare of the other driver, he did not pull his vehicle over or move it off the road.
¶ 11 According to George, Laird also exited her vehicle. They "had a brief exchange" regarding whether either had been hurt and both reported that they were uninjured. They also discussed whether or not to report the accident to the police. They determined that there was no damage to the vehicles and, thus, no need to report the accident. Laird then noticed "a little chip of paint" on her rear bumper. George testified he walked between the vehicles to look for damage and to converse with Laird regarding whether she had been hurt. He stated that, as they conversed, Laird stood near the right rear taillight of her vehicle. While George was positioned between Laird's vehicle and his own, a third vehicle, driven by Vyas, traveled across the bridge and struck the back of George's vehicle. George testified the impact pushed his vehicle forward and pinned him between the two vehicles.
¶ 12 At her deposition, Laird testified similarly to George. She described the weather as "drizzling rain" and stated she had stopped her vehicle at the "base" or "at the bottom of the bridge" due to a line of cars ahead of her. She was then rear-ended by George. Laird and George exited their vehicles and "very quickly" confirmed with each other that they were both "okay" and insured. According to Laird, they started to look to see if either vehicle was damaged and spoke about calling the police. She testified both she and George were positioned between the vehicles but she "stepped over" to look at her exhaust pipe. Laird recalled that George was walking toward her when a third vehicle "came over the bridge and could not stop." The vehicle struck George's vehicle and pinned George between his and Laird's vehicles.
¶ 13 Laird testified that after George rear-ended her, she did not move her car off to the side of the road because there were guardrails and "nowhere to go." When asked whether she had been concerned about another vehicle colliding with George's vehicle while they discussed the incident, Laird responded as follows:
"You know, it happened so fast. It was like I got out of my car, he got out of his car, we made sure we were okay, we just walked between those cars. And I-we were going to call the police and my guess-my thinking was then just move the cars somewhere. We would have had to have gone off on [the next street] somewhere or down the street further. There's not too much space from when you come off the bridge, I would guess maybe four or five car lengths, to [the next street]. But we would have had to have moved probably to another place."
¶ 14 During her deposition, Vyas testified she was traveling slowly over the bridge. She did not see anything out of the ordinary until she reached the "top" of the bridge. She did not recall whether she first saw George or his vehicle. Vyas stated she "slammed the brakes" in an attempt to avoid a collision.
¶ 15 As stated, Normal also submitted the depositions of several of its current and former employees who testified regarding the bridge reconstruction process, as well as documents pertaining to the reconstruction. Those depositions and attachments showed that, at the time of the bridge reconstruction, Normal installed a traffic calming device, called a partial traffic circle, at the west approach to the Camelback Bridge for the purpose of slowing traffic. Sometime after its installation and prior to the accident at issue on appeal, *711 *529 the partial traffic circle was removed. Normal's city manager, Mark Peterson, testified the partial circle was removed because it presented a maintenance problem, it was not effective in calming traffic, and it was a traffic hazard.
¶ 16 Normal's filings also showed that the default speed limit for the Camelback Bridge was 30 miles per hour. Employees testified that Normal had no documentation or records demonstrating that it posted or removed speed limit signage near the bridge after reconstruction. However, Wayne Aldrich, Normal's city engineer from 1998 to 2002, testified that 10-mile-per-hour advisory signs were posted at both bridge approaches after the bridge was reconstructed. He did not know if the signs were ever removed. Further, Aldrich did not recall any document that required the posting of 10-mile-per-hour advisory speed signs as part of the reconstruction project. John Hopper, a traffic technician for Normal, testified at the time of his October 2015 deposition that 10-mile-per-hour advisory speed signs were "currently" posted on both sides of the bridge. Hopper did not know when the sign for eastbound traffic was placed or who made the decision to install it. In connection with its filings, Normal asserted there was "no speed limit signage on the eastbound approach to the bridge" in 2009 as evidenced by a "2009 aerial sign inventory." Further, it alleged that, at the time of George's accident, "there was a 10 miles per hour traffic signal for westbound traffic approaching the bridge, but no similar signal for eastbound traffic."
¶ 17 In May 2016, plaintiffs filed a response to Normal's motion for summary judgment. They maintained that the vertical crest of the Camelback Bridge was unsafe with a speed limit of 30 miles per hour and, following back and forth discussions with IDOT during the reconstruction process, Normal agreed to lower the speed limit of the bridge. According to plaintiffs, Normal also agreed to the installation of a partial traffic circle on the west side of the bridge to slow traffic. Plaintiffs asserted Normal's agreements as to the reduced speed limit and partial traffic circle were incorporated into the final plans for the bridge reconstruction. They argued Normal initially implemented the agreed-upon measures but then failed to maintain them and that they were not in place at the time of George's accident.
¶ 18 Relevant to this appeal, plaintiffs further maintained that George was a motorist at the time of the incident at issue and, thus, an intended and permitted user of the Camelback Bridge under the Tort Immunity Act. Further, they asserted George's injuries were proximately caused by Normal's acts or omissions, in that Normal knew the Camelback Bridge was unsafe with a speed limit of 30 miles per hour but failed to post "lowered speed signs" or maintain the traffic calming device. Finally, plaintiffs asserted the 10-year construction statute of repose did not apply because they raised failure-to-maintain claims against Normal rather than claims solely related to the design or the construction of the bridge. In particular, they asserted Normal had an ongoing ministerial duty to maintain the lowered traffic speed signs and the partial traffic circle but that Normal failed in its duty.
¶ 19 Plaintiffs also attached several documents to their response. Those attachments included police reports regarding other accidents on the bridge that showed the Camelback Bridge had a posted speed limit of 10 miles per hour in November 2006 and August 2007 but a posted speed limit of 30 miles per hour during the later months of 2007, in 2008, and in 2009. They also submitted IDOT records showing that on February 1, 2000, during the reconstruction *712 *530 process, Aldrich sent correspondence to IDOT requesting a "design variance" for the bridge's "vertical curves on the east and west approaches." Aldrich stated:
"For a 30 MPH design speed, approximately 200 foot vertical curves are required. However, the posted speed limit will be 20 MPH with an advisory speed limit of 10 MPH at the bridge. At these speeds, 100 foot vertical curves are acceptable."
Aldrich then proposed a 100-foot vertical curve "[t]o better match the existing roadway," to minimize the effects of reconstruction on adjacent property owners, and to "minimize the limits of the roadway reconstruction." On February 23, 2000, IDOT responded to Aldrich's letter and stated it had approved his request for a design variance.
¶ 20 IDOT's records further contain a document titled "Local Project Development Report For Group II Categorical Exclusions And Design Approval," which was signed by various individuals involved in the reconstruction process in July 2000. That document showed that the plans included lowering the vertical crest of the Camelback Bridge by seven inches to increase sight distance and identified 10 miles per hour as the recommended posted speed for the new bridge. Further, it noted the following design variance for the reconstruction:
"Variance for vertical curves-For a 30 mph speed, a 200-foot vertical curve length is required. For the proposed posted speed of 20 mph with an advisory speed limit of 10 mph at the bridge, 100-foot vertical curves are requested."
¶ 21 Finally, plaintiffs submitted the affidavit of Kenneth Hemstreet, a licensed civil engineer and former IDOT employee with 45 years of experience in road, highway, and bridge construction and design. Hemstreet stated he reviewed documentation from Normal, IDOT, and private contractors regarding the Camelback Bridge reconstruction project. He averred that "stopping sight distance" was central to safe road and bridge design and described it as "the line of sight for the driver and the distance needed for a given speed limit." Hemstreet stated that "[t]he greater the speed, the more distance the driver covers in a period of time" and "the greater the stopping distance must be." When stopping sight distance is impaired, the speed limit must be reduced to bring a road or bridge into conformity with IDOT standards.
¶ 22 Hemstreet maintained that IDOT rejected proposed plans for the bridge reconstruction project that left the bridge's vertical crest largely intact and had a 30-mile-per-hour speed limit. He asserted that, ultimately, Normal proposed the installation of a partial traffic circle, a reduced speed limit of 20 miles per hour, and an advisory speed limit of 10 miles per hour for the bridge. Hemstreet asserted these proposals were accepted and included within Normal's final project development report. According to Hemstreet, Normal was required to reduce the speed limit of the Camelback Bridge from 30 miles per hour to 20 miles per hour with an advisory speed limit of 10 miles per hour and to install and maintain a partial traffic circle. Hemstreet asserted the failure to maintain both the reduced speed limit and the partial traffic circle rendered the bridge unsafe. He maintained that "[t]he rear-ending accidents that precipitated [George's] injuries" were "precisely the kind of accident that the IDOT minimum stopping sight distance standards [spoke] to and [were] designed to avoid."
¶ 23 In September 2016, the trial court conducted a hearing on Normal's motion for summary judgment and granted the *713 *531 motion. In October 2016, plaintiffs filed a motion to reconsider and for leave to file a second amended complaint. In December 2016, the trial court entered a written order denying both plaintiffs' motion to reconsider and for leave to file a second amended complaint. Additionally, the court clarified its previous order, stating it only granted summary judgment in Normal's favor on the bases that (1) the Illinois construction statute of repose barred plaintiffs' claims, (2) George was not an intended or permitted user of the Camelback Bridge, and (3) the "Doctrine of Proximate Cause" barred plaintiffs' claims.
¶ 24 This appeal followed.
¶ 25 II. ANALYSIS
¶ 26 On appeal, plaintiffs argue the trial court erred by granting Normal's motion for summary judgment. They contend the court erred in finding (1) George was not an intended and permitted user of the Camelback Bridge under the Tort Immunity Act, (2) Normal demonstrated its actions did not proximately cause George's injuries as a matter of law, and (3) the construction statute of repose barred plaintiffs' claims. Plaintiffs contend the court also erred by denying them leave to file a second amended complaint, which would have conformed their pleadings to the proof and not added any new issues to the case.
¶ 27 "Summary judgment is proper when the pleadings, depositions, affidavits, and other matters on file establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Cohen v. Chicago Park District , 2017 IL 121800, ¶ 17, 422 Ill.Dec. 869, 104 N.E.3d 436. The matters on file must be construed strictly against the moving party and liberally in favor of the opposing party. Schweihs v. Chase Home Finance, LLC , 2016 IL 120041, ¶ 48, 412 Ill.Dec. 882, 77 N.E.3d 50. "A genuine issue of material fact precluding summary judgment exists where the material facts are disputed or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts." Mashal v. City of Chicago , 2012 IL 112341, ¶ 49, 367 Ill.Dec. 223, 981 N.E.2d 951. To survive a summary judgment motion, a plaintiff is not required to prove his or her case, but he or she must present a factual basis that would arguably entitle the plaintiff to a judgment. Bruns v. City of Centralia , 2014 IL 116998, ¶ 12, 386 Ill.Dec. 765, 21 N.E.3d 684. A trial court's decision to grant a motion for summary judgment is subject to de novo review. Cohen , 2017 IL 121800, ¶ 17, 422 Ill.Dec. 869, 104 N.E.3d 436.
¶ 28 A. Intended and Permitted User
¶ 29 Plaintiffs initially argue the trial court erred in finding that George was not an intended and permitted user of the Camelback Bridge as contemplated by section 3-102(a) of the Tort Immunity Act ( 745 ILCS 10/3-102(a) (West 2012) ) and, as a result, Normal owed him no duty. Plaintiffs maintain that because George was a motorist at the time of the initial traffic collision with Laird, he was clearly an intended and permitted user of the roadway. They assert his action in exiting his vehicle after the collision was entirely foreseeable. Further, plaintiffs maintain that George was an intended and permitted user of the bridge because he was required by the Illinois Vehicle Code (Vehicle Code) to remain at the scene of his accident with Laird. See 625 ILCS 5/11-401, 11-402 (West 2012).
¶ 30 In response, Normal characterizes George as "a pedestrian standing on the bridge roadway" rather than a motorist. They argue that, because George was a *714 *532 pedestrian and the Camelback Bridge was intended for use by only motor vehicles, the trial court correctly found that Normal owed no duty to George.
¶ 31 "In a negligence action, the plaintiff must plead and prove the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and injury proximately resulting from the breach." Bruns , 2014 IL 116998, ¶ 12, 386 Ill.Dec. 765, 21 N.E.3d 684. "Whether a duty exists is a question of law for the court to decide." Id. ¶ 13. Factors that guide a court's duty analysis include "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant." Id. ¶ 14.
¶ 32 Section 3-102(a) of the Tort Immunity Act "codifies a municipality's general duty at common law to maintain its property in a reasonably safe condition." Washington v. City of Chicago , 188 Ill. 2d 235, 239, 242 Ill.Dec. 75, 720 N.E.2d 1030, 1033 (1999). That section provides as follows:
"[A] local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition." (Emphasis added.) 745 ILCS 10/3-102(a) (West 2012).
Thus, "for a public entity to owe a duty to protect a party from unreasonably dangerous conditions existing on its property, that party must be both a permitted and an intended user of the property." Washington , 188 Ill. 2d at 240, 242 Ill.Dec. 75, 720 N.E.2d 1030.
¶ 33 The general principle developed by Illinois courts is that a public entity "owes no duty of care to a pedestrian who walks in or crosses a public roadway outside a crosswalk." Curatola v. Village of Niles , 154 Ill. 2d 201, 208, 181 Ill.Dec. 631, 608 N.E.2d 882, 885 (1993). The rationale for this general principle is that, except in certain limited circumstances, courts have determined that streets are for use by vehicular traffic and not pedestrians. Id. at 210, 181 Ill.Dec. 631, 608 N.E.2d 882, 885. Exceptions to the general rule include areas of a street or roadway where a municipality has provided crosswalks or in the immediate vicinity of a legally parked vehicle. Id. Ultimately, when determining the intended use of public property, courts "need look no further than the property itself which the plaintiff was using when injured." Id. at 211, 181 Ill.Dec. 631, 608 N.E.2d 882, 885.
¶ 34 Here, there is essentially no dispute that the Camelback Bridge was intended for use by vehicular traffic. In particular, there is no evidence of any markings on the bridge that would indicate Normal intended it for any other use, including use by pedestrians. It is also undisputed that at the time of his collision with Laird, George was utilizing the roadway as a motorist. George testified he drove his vehicle over the crest of the bridge, observed Laird's vehicle stopped in the lane ahead of him, and could not stop his own vehicle in time to avoid a collision. Although Normal maintains that George subsequently became a pedestrian-and therefore not *715 *533 an intended user of the bridge-because he exited his vehicle after that collision and stood upon the roadway, we must disagree.
¶ 35 In arguing that George was an intended and permitted user of the Camelback Bridge, plaintiffs rely heavily on the supreme court's decision in Greene v. City of Chicago , 73 Ill. 2d 100, 22 Ill.Dec. 507, 382 N.E.2d 1205 (1978). In that case, the plaintiff's vehicle stalled on a city street and he was struck by another vehicle while retrieving a warning flare from his vehicle's trunk. Id. at 103-04, 22 Ill.Dec. 507, 382 N.E.2d 1205. Following a bench trial, a judgment was entered in the plaintiff's favor and the municipal defendant appealed. Id. at 103, 22 Ill.Dec. 507, 382 N.E.2d 1205. On review, the supreme court affirmed the lower court's judgment in favor of the plaintiff. Id. at 113, 382 N.E.2d 1205, 22 Ill.Dec. 507. Although the Greene court was not asked to address whether the plaintiff was an intended and permitted user of the city street at the time of his injury, subsequent cases considering that issue have commented on Greene and identified the Greene plaintiff as a motorist and intended user of the street.
¶ 36 In Wojdyla v. City of Park Ridge , 148 Ill. 2d 417, 419-20, 170 Ill.Dec. 418, 592 N.E.2d 1098, 1099-100 (1992), the plaintiff filed an action against a municipality and an electrical company after her husband was struck by a car and killed as he attempted to cross a six-lane highway midblock to reach his parked vehicle. The plaintiff alleged the defendants negligently placed and maintained streetlights on the highway. Id. at 419, 170 Ill.Dec. 418, 592 N.E.2d 1098. The defendants filed motions for summary judgment, which the trial court granted, and the plaintiff appealed. Id. The supreme court affirmed, finding the plaintiff's husband was not an intended and permitted user of the highway at the time of the accident. Id. at 426, 428, 170 Ill.Dec. 418, 592 N.E.2d 1098. In so holding, it distinguished Greene , stating a duty was owed to the Greene plaintiff because he was a "motorist" and "an intended user of the street." Id. at 427, 170 Ill.Dec. 418, 592 N.E.2d 1098.
¶ 37 Similarly, Swett v. Village of Algonquin , 169 Ill. App. 3d 78, 81, 119 Ill.Dec. 838, 523 N.E.2d 594, 596 (1988), involved pedestrians who were struck by a vehicle while crossing a highway to reach a restaurant parking lot. Again, the reviewing court found no duty owed by the village, and it distinguished Greene on the basis that the plaintiff in that case had been utilizing the roadway as a motorist. Id. at 94, 119 Ill.Dec. 838, 523 N.E.2d 594, 596. Specifically, the court stated as follows:
"[T]he [ Greene ] plaintiff was a motorist-a person using the street as it was intended to be used-despite the fact that in Greene , the motorist's car had stalled and he was hit by another motorist while he was standing on the roadway behind his disabled vehicle. He was nonetheless utilizing the street as a motorist, not as a pedestrian." Id.
See also Ramirez v. City of Chicago , 212 Ill. App. 3d 751, 757, 156 Ill.Dec. 842, 571 N.E.2d 822, 826 (1991) (identifying Greene as an exception to the general rule that streets are for use by vehicles and not pedestrians because the "plaintiff was standing near or attending a disabled vehicle").
¶ 38 Like the plaintiff in Greene , George is best characterized as a motorist. He was driving his vehicle over the Camelback Bridge at the time of the initial collision with Laird. Although he ultimately exited his vehicle at the site of the motor vehicle collision, he, nevertheless, was using the bridge as a motorist, not a pedestrian.
¶ 39 We note that in response to Greene , Normal cites *716 *534 Sisk v. Williamson County , 167 Ill. 2d 343, 212 Ill.Dec. 558, 657 N.E.2d 903 (1995). In that case, the plaintiff was driving on a country road "when his car inadvertently struck a concrete bridge which crossed a creek." Id. at 346, 657 N.E.2d 903, 212 Ill.Dec. 558. "After the collision, [the] plaintiff exited the automobile to examine the vehicle for damage" and "fell from the bridge to the creek bed below, sustaining injuries." Id. The plaintiff complained that weeds had grown in and around the concrete bridge structure and the right-of-way of the roadway, obstructing the edge of the roadway, the right-of-way, and the creek bed. Id. The trial court determined the defendant county owed no duty to the plaintiff, and the supreme court affirmed. Id. at 345, 352-53, 657 N.E.2d 903, 212 Ill.Dec. 558.
¶ 40 We find Sisk distinguishable. Notably, the plaintiff in that case did not dispute that he was a pedestrian at the time of his injury. Further, he argued that the supreme court "should recognize an exception to the general rule [that pedestrians are not intended users of streets] and hold that pedestrians are intended and permitted users of rural country roads." Id. at 348, 212 Ill.Dec. 558, 657 N.E.2d 903. To support his argument, the plaintiff relied on portions of the Vehicle Code that permit pedestrians to walk on a roadway when no sidewalks or shoulders of the road are available. Id. (citing 625 ILCS 5/11-1007 (West 1992) ). The court rejected the plaintiff's argument, finding a duty of care should not be imposed on the defendant county "to keep its rural country roads free from defects which may cause injuries to pedestrians." Id. at 345, 212 Ill.Dec. 558, 657 N.E.2d 903.
¶ 41 Unlike the plaintiff in Sisk , plaintiffs in this case argue that George was a motorist at the time of the accident. Further, they seek to impose a duty upon Normal to keep the Camelback Bridge safe for use by motor vehicles, not pedestrians. Additionally, we note plaintiffs also argue that Normal's negligence caused both of the underlying collisions in this case-George's initial collision with Laird, which occurred when he was indisputably a motorist, and the second collision between Vyas's vehicle and George's vehicle. Thus, unlike Sisk , where the county's alleged negligence only resulted in harm to the plaintiff as he used the road as a pedestrian, Normal's alleged negligence in this case resulted in harm to George as a motorist on the bridge.
¶ 42 Finally, we note that the Tort Immunity Act provides that a public entity owes a duty to maintain its property in a reasonably safe condition for "people whom the entity intended and permitted to use the property in a manner in which * * * it was reasonably foreseeable that it would be used." (Emphasis added.) 745 ILCS 10/3-102(a) (West 2012). Thus, to the extent Normal suggests that George simply cannot be considered a motorist because he exited his vehicle and stood or walked on the bridge, we must disagree. As demonstrated by Greene , a reasonably foreseeable use of a city street by a motorist may include exiting a disabled vehicle. We find it is reasonably foreseeable that a motorist involved in a motor vehicle collision might exit a vehicle for safety reasons; to warn other motorists of a collision; to render aid to a person involved in the collision; or, as in this case, to determine the well-being of another driver.
¶ 43 Accordingly, we find that George, like the plaintiff in Greene , was utilizing the Camelback Bridge as a motorist. He was, therefore, an intended and permitted user of the bridge, and the trial court erred in granting summary judgment in Normal's favor on this asserted basis.
*717 *535 ¶ 44 B. Proximate Cause
¶ 45 On appeal, plaintiffs next argue that the trial court erred in finding Normal demonstrated a lack of proximate cause as a matter of law. They maintain that a proximate cause relationship clearly existed between Normal's "abdication of its maintenance obligations" with respect to both the speed limit signs and the traffic circle and George's injury.
¶ 46 Normal responds by arguing that it did nothing more than furnish a condition by which injury was possible and any causal connection between the condition of the bridge and George's injury was broken by independent intervening acts. Normal identifies those intervening acts as George's action in exiting his vehicle to unnecessarily inspect damage from his collision with Laird and George's and Vyas's actions in disobeying traffic laws that require motorists to reduce their speed in observation of traffic and road conditions. See 625 ILCS 5/11-601(a) (West 2012) ("The fact that the speed of a vehicle does not exceed the applicable maximum speed limit does not relieve the driver from the duty to decrease speed * * * when approaching a hill crest * * *.").
¶ 47 "The term 'proximate cause' contains two elements: cause in fact and legal cause." Krywin v. Chicago Transit Authority , 238 Ill. 2d 215, 225-26, 345 Ill.Dec. 1, 938 N.E.2d 440, 446 (2010). "A defendant's conduct is a 'cause in fact' of the plaintiff's injury only if that conduct is a material element and a substantial factor in bringing about the injury." Abrams v. City of Chicago , 211 Ill. 2d 251, 258, 285 Ill.Dec. 183, 811 N.E.2d 670, 675 (2004). "A defendant's conduct is a material element and substantial factor in bringing about the injury if, absent that conduct, the injury would not have occurred." Id. By contrast, whether a defendant's conduct is the "[l]egal cause" of a plaintiff's injury "is largely a question of foreseeability." (Internal quotation marks omitted.) Id. When considering the "[l]egal cause" element of proximate cause, "[t]he relevant inquiry is whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct." (Emphasis and internal quotation marks omitted.) Id.
¶ 48 In First Springfield Bank & Trust v. Galman , 188 Ill. 2d 252, 257, 242 Ill.Dec. 113, 720 N.E.2d 1068, 1071 (1999), the supreme court noted that "Illinois courts draw a distinction between a condition and a cause." Specifically, "if the negligence charged does nothing more than furnish a condition by which the injury is made possible, and that condition causes an injury by the subsequent, independent act of a third person, the creation of the condition is not the proximate cause of the injury." Id. The test to apply "is whether the first wrongdoer reasonably might have anticipated the intervening efficient cause as a natural and probable result of the first party's own negligence." Id. The court further stated as follows:
"[W]hen [cases] ask whether the defendant's conduct was a cause of the injury or simply furnished a condition by which the injury was made possible, they are in effect asking whether the defendant's conduct was a material and substantial element in bringing about the injury. Similarly, when [cases] ask whether the defendant might have reasonably anticipated the intervening efficient cause as a natural and probable result of his or her own negligence, they are in effect asking whether the intervening efficient cause was of a type that a reasonable person would see as a likely result of his or her conduct." Id. at 259, 242 Ill.Dec. 113, 720 N.E.2d 1068, 1071.
¶ 49 "Proximate cause is generally an issue of material fact in a negligence *718 *536 suit." Abrams , 211 Ill. 2d at 257, 285 Ill.Dec. 183, 811 N.E.2d 670. "Although the issue of proximate cause is ordinarily a question of fact determined by the trier of fact, it is well settled that it may be determined as a matter of law by the court where the facts as alleged show that the plaintiff would never be entitled to recover." Id. at 257-58, 285 Ill.Dec. 183, 811 N.E.2d 670, 675.
¶ 50 Here, plaintiffs presented evidence that the crest of the Camelback Bridge was unsafe when agreed-upon measures to slow the speed of motorists on the bridge were not in place. The record reflects no such measures were present for eastbound traffic on the day of George's accident and that the default speed limit on the bridge was 30 miles per hour, a speed that was not in line with IDOT's standards for stopping sight distance. Both George and Vyas testified to observing obstacles in their lane of travel as they went over the crest, or the "top," of the bridge, and being unable to stop in time to avoid a collision. Evidence reflects that George was traveling at a speed of 25 miles per hour while Vyas testified she was traveling "slowly." Additionally, Hemstreet averred that rear-end collisions like the ones that occurred in this case were "precisely the kind of accident that IDOT minimum stopping sight distance standards" were "designed to avoid."
¶ 51 Under these circumstances, we find a question of fact exists as to whether George's injury would have occurred absent Normal's failure to maintain speed limit signage or a traffic calming device at the eastbound approach to the bridge. A reasonable jury could find that, had measures been employed to slow traffic, George and Vyas would have reduced their speeds when crossing the bridge and avoided colliding with the vehicles that were stopped ahead of them.
¶ 52 Additionally, we find that the injury here was reasonably foreseeable by Normal. Again, plaintiffs presented evidence that the danger posed by an inadequate stopping sight distance is that motorists will not have sufficient time to perceive and react to a hazard in the roadway. According to expert testimony, where stopping sight distance is impaired, speed limits should be reduced. Given these circumstances, Normal could reasonably anticipate that, without measures to reduce speeds across a bridge that had an impaired stopping sight distance, motorists would be unaware of the danger posed and fail to reduce their speeds in order to avoid obstacles in the roadway.
¶ 53 As stated, Normal also contends that George's decision to exit his vehicle and stand upon the roadway was an intervening act that broke the chain of causation between its actions and George's injuries. However, that George's alleged negligence may have contributed to his injury does not necessarily sever the causal relationship between his injury and Normal's alleged negligent conduct. As plaintiffs point out, there may be more than one proximate cause of an injury. See Wagner v. City of Chicago , 254 Ill. App. 3d 842, 857, 193 Ill.Dec. 676, 626 N.E.2d 1227, 1238 (1993) ("[A] party guilty of negligence cannot avoid responsibility merely because another party is also guilty of negligence contributing to the same injury * * *."). Again, the appropriate test "is whether the first wrongdoer reasonably might have anticipated the intervening efficient cause as a natural and probable result of the first party's own negligence." Galman , 188 Ill. 2d at 257, 242 Ill.Dec. 113, 720 N.E.2d 1068. We find Normal could reasonably have anticipated that a motorist involved in a collision on the bridge might have to exit their vehicle for various reasons, including *719 *537 to check on the well-being of another driver, as was George's purported reasoning in the instant case.
¶ 54 We note that, on appeal, both parties cite several cases to support their respective proximate cause arguments. Ultimately, the cases relied upon by plaintiffs are more persuasive and representative of the factual circumstances presented by this case. Accordingly, we find the trial court also erred in determining as a matter of law that Normal's conduct was not a proximate cause of plaintiffs' injuries and granting summary judgment on that basis.
¶ 55 C. Statute of Repose
¶ 56 Finally, on appeal plaintiffs argue the trial court erred in finding their claims were barred by the construction statute of repose. They acknowledge that the statute of repose bars claims related to the negligent design and construction of property brought more than 10 years after the design or construction activities. Further, they do not dispute that more than 10 years have passed since the Camelback Bridge was reconstructed. Instead, plaintiffs maintain that their claims against Normal are not related to the design and construction of the bridge but grounded on Normal's "negligent performance of its ministerial duty of care to maintain safe speed limit signage and to maintain the existence of the traffic circle."
¶ 57 Section 13-214(b) of the Code of Civil Procedure (Code) ( 735 ILCS 5/13-214(b) (West 2012) ) provides as follows:
"No action based upon tort, contract or otherwise may be brought against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction, or construction of an improvement to real property after 10 years have elapsed from the time of such act or omission."
"This statute applies whenever (1) the product at issue is an improvement to real property and (2) the defendant's activities fall within those listed in the statute." Ryan v. Commonwealth Edison Co. , 381 Ill. App. 3d 877, 882, 319 Ill.Dec. 273, 885 N.E.2d 544, 548 (2008).
¶ 58 "The construction statute of repose was enacted for the express purpose of insulating all participants in the construction process from the onerous task of defending against stale claims." MBA Enterprises, Inc. v. Northern Illinois Gas Co. , 307 Ill. App. 3d 285, 288, 240 Ill.Dec. 500, 717 N.E.2d 849, 852 (1999). "The plain language of section 13-214(b) reflects that purpose but bars only those claims regarding the construction of an improvement to real property." Id.
¶ 59 In MBA Enterprises , the plaintiffs brought suit against a gas company to recover damages caused by a gas explosion and fire on their property. The trial court granted summary judgment in favor of the gas company, finding the 10-year statute of repose barred the plaintiffs' claims. Id. at 287, 240 Ill.Dec. 500, 717 N.E.2d 849, 852. On review, the Third District noted that although the plaintiffs alleged a number of negligent acts by the gas company that clearly fell "within the purview of installation and construction" by the company of a gas piping system, they also raised claims of negligent operation and maintenance. Id. at 288, 240 Ill.Dec. 500, 717 N.E.2d 849, 852. The court stated those latter claims were based on the theory that the gas company had "an ongoing duty of care to operate and maintain the gas system in a safe manner" and that the claims "survive[d] apart from the plaintiffs' claims related to the initial construction of the system." Id. Consequently, the court reversed the trial court's dismissal of the portion of the plaintiffs' complaint that contained those claims. Id.
*720 *538 ¶ 60 In Ryan , 381 Ill. App. 3d at 878, 319 Ill.Dec. 273, 885 N.E.2d 544, the plaintiff was an electrician who was injured in an on-the-job circuit breaker explosion. He brought suit against a power supplier, alleging it was responsible for the electrical current that flowed into the building where the accident occurred and that it failed to adequately perform its ongoing maintenance duties. Id. The trial court granted summary judgment in favor of the power supplier on the basis that the plaintiff's claim was time barred by the construction statute of repose. Id. On review, the First District reversed. Id. It held that "one must look to the specific activity in question rather than the fact that the negligence in inspection was perpetrated by the same party that installed the system in question." Id. at 885, 319 Ill.Dec. 273, 885 N.E.2d 544, 548. The court concluded that "even though a design professional receives the protection of the statute of repose for design and installation-related activities, it does not receive protection for other activities that are not within the purview of the statute," including activities related to a "breach of duty by one who undertakes inspection and maintenance duties." Id. at 887, 319 Ill.Dec. 273, 885 N.E.2d 544, 548.
¶ 61 Here, plaintiffs' amended complaint clearly raised several claims of negligence relating to the design and reconstruction of the Camelback Bridge, activities that occurred well in excess of 10 years prior to the filing of plaintiffs' complaint and that are barred by section 13-214(b) of the Code. Specifically, plaintiffs alleged the bridge had "an excessive and unsafe crest" and "an unsafe and improper road surface relative to the coefficient of friction." Further, they asserted Normal refused to cause or allow either "the bridge crest to be modified to a safe elevation" or "the bridge to be resurfaced with [a] proper and safe surface." All of these allegations are directed to design and reconstruction activities and, thus, are barred by the 10-year statute of repose.
¶ 62 However, like in MBA Enterprises , plaintiffs in this case also raised claims unrelated to the issues of design and construction. In particular, they alleged Normal maintained and controlled the bridge, "[p]osted, caused[,] and/or allowed an excessive speed limit for the bridge," and "[r]efused to cause or allow the speed limit at and around the bridge to be reduced." We note that "although a governmental agency has discretion in determining whether to perform a public work or make an improvement, once the decision to perform the work is made, it must be done with reasonable care and in a nonnegligent manner." Snyder v. Curran Township , 167 Ill. 2d 466, 474-75, 212 Ill.Dec. 643, 657 N.E.2d 988, 993 (1995). Relative to their maintenance claims, plaintiffs do not allege defects in the design and construction of the bridge. Rather, they assert that Normal acted negligently "in connection with the maintenance of the speed signs and the continuation of the existence of the traffic circle" that were intended at the time of the reconstruction process and initially implemented by Normal. We find the cases cited by Normal are distinguishable and the trial court erred in finding plaintiffs' maintenance-related claims were barred by section 13-214(b).
¶ 63 As set forth above, the trial court erred in finding George was not an intended and permitted user of the Camelback Bridge at the time of the accident and that plaintiffs could not establish proximate cause as a matter of law. Accordingly, the court erred in granting Normal's motion for summary judgment on those bases. Additionally, although the court correctly found plaintiffs raised design-related and *721 *539 construction-related negligence claims that are barred by the 10-year statute of repose, it erred in finding plaintiffs' maintenance-related negligence claims were also barred. Thus, we affirm only the court's grant of summary judgment as it relates to claims by plaintiffs that Normal was negligent in the design and reconstruction of the Camelback Bridge. We otherwise reverse the court's grant of summary judgment in Normal's favor.
¶ 64 In reaching our decision, we note that, in its motion for summary judgment, Normal asserted multiple bases for relief. However, the trial court limited its grant of summary judgment to only the three bases discussed on appeal. As Normal does not argue that any additional alleged bases would support the court's grant of summary judgment in its favor, we do not address them. Finally, given that we reverse the trial court's grant of summary judgment, we find it unnecessary to address plaintiffs' additional contention on appeal that the court erred by denying their motion for leave to file an amended complaint.
¶ 65 III. CONCLUSION
¶ 66 For the reasons stated, we affirm in part and reverse in part the trial court's judgment and remand for further proceedings.
¶ 67 Affirmed in part and reversed in part; cause remanded.
Justices Holder White and Turner concurred in the judgment and opinion.