2020 IL App (1st) 192071

No. 1-19-2071

Fourth Division
December 24, 2020

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

|  |  |
|---|---|
| EMPRESS CASINO JOLIET CORPORATION,<br>    Plaintiff-Appellant,<br><br>v.<br><br>AVERUS, INC., f/k/a Facilitec Central, Inc.,<br>    Defendant-Appellee<br>_____<br><br>NATIONAL FIRE AND MARINE INSURANCE<br>COMPANY, LLOYD'S SYNDICATE 1414 (Ascot),<br>and AXIS INSURANCE COMPANY, as Subrogees of<br>Empress Casino Joliet Corporation,<br>    Plaintiffs-Appellants,<br><br>v.<br><br>AVERUS, INC., f/k/a Facilitec Central, Inc.,<br>    Defendant-Appellee. | Appeal from the Circuit Court<br>of Cook County.<br><br>No. 2017 L 008305<br><br>The Honorable<br>James N. O'Hara,<br>Judge Presiding. |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Lampkin and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1      The instant appeal arises from a fire that severely damaged the Joliet casino of plaintiff Empress Casino Joliet Corporation in 2009. Plaintiff, and several companies that had issued plaintiff insurance policies, filed suit against defendant Averus, Inc. (Averus), alleging that

Averus' failure to properly clean the ducts in the casino's kitchen caused the fire. The trial court granted summary judgment in favor of Averus, finding that Averus had not breached any duty to plaintiff and that, at most, Averus' conduct furnished a condition that was not a proximate cause of the fire. Plaintiff and the insurance companies appeal and, for the reasons that follow, we affirm.

¶ 2                                                    BACKGROUND

¶ 3          On March 20, 2009, a large portion of plaintiff's Joliet casino was destroyed when a fire broke out during the course of casino renovations, causing over $80 million worth of damage. Plaintiff filed a lawsuit in 2012 in case No. 12 L 012077 against a number of entities it alleged were responsible for the fire, including its general contractor, architect, engineer, sprinkler contractor, sheet metal contractor, and Averus, its kitchen exhaust system cleaning contractor. In 2014, plaintiff's insurance companies filed a similar subrogation lawsuit in case No. 14 L 003223, seeking reimbursement for payments that they made to plaintiff under their insurance policies; the two cases were consolidated in June 2014. The defendants jointly filed a motion for summary judgment, claiming that a waiver of subrogation clause in the contractors' contract barred the claims of both plaintiff and the insurance companies. On March 30, 2015, the trial court granted the motion for summary judgment, finding that the waiver of subrogation clause barred the claims against all of the contractors. Plaintiff and the insurance companies appealed, and a different panel of this court affirmed the grant of summary judgment with respect to all of the contractors, apart from Averus. *Empress Casino Joliet Corp. v. W.E. O'Neil Construction Co.*, 2016 IL App (1st) 151166.

¶ 4     On remand, the case, which now includes only Averus as a defendant, was renumbered as case No. 17 L 008305. As Averus is now the sole defendant, we relate the allegations of plaintiff's complaint only as they relate to Averus and its alleged culpability.[1]

¶ 5     According to the complaint, the casino is actually a complex consisting of several buildings. During 2008 and 2009, plaintiff began renovations on the casino complex, beginning with renovation to the steakhouse and kitchen. Plaintiff had an existing relationship with Averus, which had contracted to provide certain cleaning and maintenance services at the casino pursuant to an oral contract. Averus' responsibilities included the cleaning and removal of cooking grease and other combustible residue from the ductwork in and above the kitchen. On October 19, 2008, Averus performed cleaning services at the casino, including cleaning the kitchen ductwork. However, the complaint alleges that Averus did not properly perform this cleaning, leaving the interior of the ductwork "coated, covered and caked with large quantities of cooking grease and other combustible residue."

¶ 6     According to the complaint, on March 20, 2009, Mike Haberzetle, a welder employed by Jameson Sheet Metal, Inc. (Jameson), the sheet metal contractor on the project, was preparing to weld a new piece of sheet metal ductwork to the existing ductwork for a range exhaust hood that was being relocated in the buffet kitchen area. There was no one assigned to provide a "fire watch" for this work, nor were other precautions taken for "hot" work. The complaint alleged that Haberzetle later told the Joliet Police Department that, when he reached the existing ductwork, he noticed a large amount of cooking grease and other combustible residue coating the inside of the duct. Haberzetle spent approximately one hour scraping grease from

---

[1] While the insurance companies remain plaintiffs in their lawsuit, we refer to plaintiff in the singular, as the insurance companies do not make any independent arguments.

the inside of the existing duct, then clamped the ducts together and began welding. While he was welding, grease inside the existing duct caught fire. Haberzetle lowered the lift he was using to the floor, searched for a fire extinguisher nearby, then left the kitchen in an attempt to locate a fire extinguisher. When he returned, the fire was out of control and the fire department was contacted. Haberzetle's supervisor informed the police that the kitchen exhaust duct had accumulated approximately 15 years of cooking grease, which was one of the reasons they were unable to control the fire. Counts XVI (for negligence) and XVII (for breach of contract), the counts directed at Averus, alleged that Averus failed to properly clean the ducts, causing the fire; count XI of the insurance companies' complaint (for negligence) contains similar allegations.

¶ 7    On March 12, 2019, Averus filed a motion for summary judgment, claiming that (1) plaintiff had failed to establish that Averus breached any duty, (2) any alleged negligent act was merely a condition and not the proximate cause of the fire, (3) it was not reasonably foreseeable that plaintiff would continue to use the kitchen after it had canceled Averus' scheduled cleaning in December 2008 and that Haberzetle would proceed with welding the duct after observing grease in the ductwork, and (4) the insurance companies' claims were barred by the statute of limitations.

¶ 8    Averus claimed that it contacted plaintiff on December 5, 2008, to schedule a cleaning of the kitchen ductwork, but was advised by plaintiff that the kitchen was being remodeled and that the cleaning would need to be rescheduled until sometime in 2009. Nevertheless, plaintiff continued to use the kitchen until January 4, 2009. Averus attempted to schedule cleanings twice more in March, prior to the March 2009 fire, but plaintiff never returned Averus' calls. Thus, Averus claimed that it attempted to fulfill its duties under the parties' contract, but

plaintiff declined Averus' services. Accordingly, Averus claimed that plaintiff had failed to establish any breach on the part of Averus.

¶ 9        Averus additionally claimed that any allegedly negligent act on its part merely furnished a condition, and was not a proximate cause of the fire. Averus argued that Haberzetle's conduct in welding the ductwork in the presence of grease and without a fire watch, fire extinguisher, or fire blankets present constituted an intervening cause that broke any causal connection between any alleged wrong on Averus' part and the injury. Averus further claimed that it "could not have reasonably anticipated the numerous intervening acts by [plaintiff] and its third-party contractor, which were the superseding and proximate cause of the fire." Specifically, Averus could not have foreseen that plaintiff would continue to use the kitchen despite canceling Averus' scheduled cleaning, allowing grease to build up, nor could it have foreseen that Haberzetle would proceed with welding the ductwork despite being aware of the presence of grease and despite the absence of safety precautions. Accordingly, Averus claimed that plaintiff had failed to establish proximate cause.

¶ 10       Finally, Averus claimed that the insurance companies' complaint was barred by the statute of limitations. Averus claimed that the applicable statute of limitations was four years, and that the insurance companies had filed their complaint a year after the expiration of the statute of limitations.

¶ 11       Attached to Averus' motion for summary judgment were a number of exhibits, including the parties' pleadings, appellate briefs for the prior appeal, and discovery responses. We discuss here only those exhibits relevant to the issues on appeal.

¶ 12       In his discovery deposition, Donald Stewart, vice president of Averus' fire division, testified that Averus (known as Facilitec at the time) began cleaning the casino's kitchen

exhaust hoods and ducts in 2007 or 2008. Stewart testified that, according to the notes in Averus' system, Averus last cleaned the hood in October 2008, and plaintiff "pushed us off in December when we called," asking for the next cleaning to be rescheduled to March 2009; Stewart was not involved in contacting plaintiff himself. Stewart further testified that Averus had, at least twice, presented plaintiff with proposals to add nine fan access doors and three duct access panels prior to the time of the fire.

¶ 13    In an affidavit, James Cantrell averred that, in December 2008, he was employed by Averus as a scheduler and, in that role, contacted "Empress" on December 5, 2008, to schedule the regular cleaning of the kitchen ductwork. He was advised "by an Empress representative" that the kitchen was under construction, so the cleaning would need to be rescheduled until some time in 2009; Cantrell averred that Averus "was not advised that the construction/remodel work would involve welding old ductwork in the buffet kitchen." Cantrell averred that Averus next contacted plaintiff on March 11, 2009, to schedule the cleaning, but Averus was told to call back the next day. A subsequent phone call was made on March 13, 2009, and a message was left, but Averus never received a response to the message. Cantrell also averred that an attached scheduling log relating to the casino's buffet kitchen was a true and correct copy made in the regular course of Averus' business, and was made at the time documented in the log. The log showed that, on December 5, 2008, Cantrell made a scheduling note that provided, "under construction/remodel need to push to 2009." On March 11, 2009, an individual named Analid Hernandez made a scheduling note that provided, "called to schedule, told to call tomorrow." On March 13, 2009, Hernandez made another scheduling note that provided, "left message."

¶ 14    In his discovery deposition, Matthew Reisman, vice president of Averus' kitchen exhaust cleaning division, testified that he reviewed Averus' service reports after the fire and noticed

that there were "deficiencies that needed to be taken care of, the access panels that had not been approved for installation." He explained that it was "part of our responsibility as technicians to identify problems on-site and document them"; Reisman was not involved in preparing the deficiency notice or in approving it before it was sent to plaintiff. Reisman identified two deficiency notices, dated March 29, 2007, and March 10, 2008, that had been sent to plaintiff. Reisman testified that the deficiency notices did not identify the specific portions of the ductwork that were inaccessible.

¶ 15    Reisman testified that the agreement between Averus and plaintiff required Averus to clean the exhaust system in compliance with the National Fire Protection Association (NFPA) standard 96. Reisman testified that NFPA 96 required cleaning of "all accessible areas" of the exhaust system. Reisman explained that this meant that "the hood duct and fan are required to be cleaned, but it also requires access to get into those areas because without access, we can't clean the areas." Reisman testified that, after a deficiency was noted, the property owner was required to correct the deficiency under NFPA 96, but that plaintiff had not done so. Reisman testified that he was a voting member of the committee responsible for NFPA 96, and that, in his opinion, Averus had complied with the standard.

¶ 16    In his discovery deposition, Haberzetle, the welder working on the ductwork at the time of the fire, testified that, on the day of the fire, he and his brother Kevin were assigned to work on attaching a new piece of ductwork to the existing ductwork in the buffet kitchen. When Haberzetle observed the project, he was "nervous," because he "noticed that there was grease inside the existing duct right away." Haberzetle testified that the grease covered all four sides of the duct and "was caked on *** hard, like a lava rock would be about the consistency." Haberzetle discussed the grease with Tim Joyce, his foreman, and Joyce instructed him to clean

7

out four inches from the edge prior to welding. However, Haberzetle chose to clear 12 inches, "because I didn't feel comfortable with it the whole time." He used a chisel and screwdriver to break up the solid level, and discovered oily residue underneath. Haberzetle estimated that the layer of grease was between 1½ and 2½ inches thick.

¶ 17    Haberzetle testified that he was "really uncomfortable" with the idea of welding in the presence of grease, especially when Joyce sent Kevin to a different location. Haberzetle asked Joyce who would serve as his fire watch, and Joyce responded that he would serve as Haberzetle's fire watch because he would "be in the area." Haberzetle testified that he could "see where this is going," and asked if he could at least have a fire extinguisher on the lift that he was using "for a grease fire." Joyce responded that he would retrieve one, and instructed Haberzetle to begin in the meantime. Haberzetle testified:

> "I was really uncomfortable doing it from the get-go. We weren't following the right procedures.
>
> Fire watch is required right off the bat. When you get the burn permit—before I can touch a welder or do anything, someone has to get a burn permit. And on that burn permit, you're required to list who your welder is, who your fire watch is. And your fire watch is to stand there with a fire extinguisher and be my eyes and ears while I'm under the hood, right. I just see darkness and a little bit of blue light when I'm welding.
>
> So someone else is responsible to make sure that nothing else starts on fire and that everything else is, you know, going okay. And I saw that I was not going to have that, so I was very uncomfortable, let alone to be doing it on a greasy duct like this."

Haberzetle testified that he was informed that if he did not weld on the duct, he would be fired, and someone else would do the work.

¶ 18    Haberzetle testified that he began welding, then flipped up his hood to check the quality of the weld and noticed a bit of smoke coming from the elbow of the duct, approximately 15 feet away from where he was welding. He continued working, "keeping an eye on it," because some smoke was normal during the welding process, and often touching the area near where he was working to ensure that it was not becoming warm. One of the times he checked, he noticed that the top of the duct was becoming warm and observed the top of the duct beginning to bow. He immediately lowered down from the lift and went in search of a fire extinguisher. Haberzetle testified that he was required to have a designated fire extinguisher, but that Joyce had never returned with one, so he went to a nearby station that was supposed to contain a fire extinguisher for the general worksite, but there was no fire extinguisher in the holder. Haberzetle went to search for a fire extinguisher, and, along the way, informed the nearest worker from the general contractor of the fire, who immediately contacted the fire department. The fire quickly grew out of control, and, despite the fire department's quick arrival, nothing could be done.

¶ 19    In response to Averus' motion for summary judgment, on March 19, 2019, plaintiff filed a motion to allow discovery, seeking to depose several witnesses: three police officers; Joyce, Jameson's foreman on the casino renovation; Kevin Haberzetle; and four Averus technicians. On March 21, 2019, the trial court permitted the depositions of these witnesses, as well as the deposition of Cantrell, whose affidavit was attached to Averus' motion for summary judgment.

¶ 20    On June 3, 2019, plaintiff filed a response to Averus' motion for summary judgment, claiming that there were numerous disputed issues of material fact and Averus was not entitled to judgment as a matter of law. Attached to the response were a number of exhibits, including

excerpts from several deposition transcripts; the entirety of the transcripts do not appear in the record on appeal.[2]

¶ 21    In his discovery deposition, Stewart[3] testified to the accuracy of a two-page, unsigned contract between Averus and plaintiff, and testified that there was no signed version but that there was verbal approval for the work. The contract, which was between plaintiff and Averus' predecessor, Facilitec, provided, in relevant part:

"Facilitec will clean your exhaust system in compliance with NFPA 96 Standards.

A. HOOD: Clean the entire hood accessible areas of the duct work, plenum, wipeout, scrape if necessary, and polish.

B. DUCT WORK: Clean from the fans down then up the ductwork from the hood.

C. ROOF: Clean fans outside and then flip if possible to clean underside of fan and down the ductwork."

¶ 22    In his discovery deposition, Officer Fernando Urquidi of the Joliet Police Department testified that he completed an incident report related to the fire. Urquidi testified that he interviewed Steven Shroba, Jameson's superintendent, who informed him that the fire began when a welder's sparks ignited a kitchen duct that was coated with cooking grease. Shroba further informed Urquidi that the duct had accumulated approximately 15 years of cooking grease, which was one reason they were unable to control the fire. Urquidi also spoke with

---

[2] Averus attached the entire deposition transcripts for Steven Shoba and James Cantrell to its reply. Plaintiff also attached the entire deposition transcript for Epimaro Nemecio to a response to a motion to strike, but it is not attached to any of the briefing on the summary judgment motion.

[3] Stewart, vice president of Averus' fire division, was deposed twice—once in 2014 and once in 2018.  The deposition transcript attached to Averus' motion for summary judgment and discussed above was from the second deposition, in 2018, while the excerpts attached to the response are from the first deposition in 2014.

Haberzetle, who informed him that the fire began when the sparks from his welding ignited grease in the kitchen ducts.

¶ 23    In his discovery deposition, Joyce, Jameson's foreman at the time of the fire, testified that, on the day of the fire, he received a phone call from John Kapidis, another Jameson worker, informing him that a grease duct that they were modifying had caught fire. Joyce ran to the area, where he observed the fire. Joyce testified that he had been on a different portion of the casino grounds, measuring ductwork.

¶ 24    In his discovery deposition, Shroba, Jameson's supervisor, testified that Joyce informed him that there was a "thin, hard film" on the duct, but no grease. Shroba denied telling the police that there had been grease on the duct.

¶ 25    In his discovery deposition, Kevin Haberzetle testified that, when he looked into the old duct, he observed flaky, rust-colored sediment at the bottom of the duct, which they scraped out using a scrap piece of metal. He worked with his brother for most of the project and served as a fire watch, but was relocated to a different area, with Kapidis replacing him.

¶ 26    In his discovery deposition, Kapidis testified that he never took over as Haberzetle's fire watch and did not have any conversations with Kevin about it.

¶ 27    In his discovery deposition, Epimaro Nemecio, an Averus technician who serviced the duct, testified that they cleaned only the accessible areas of the ductwork, and that there were portions of the ductwork in which "there were no doors." Nemecio further testified that "we reported all the time that we needed doors on" those portions.

¶ 28    In his discovery deposition, Cantrell testified that his knowledge as to any phone calls made to plaintiff came from the scheduling log, and that it would be "almost impossible to remember a specific phone call," because he made hundreds of phone calls a week and it had been 10

years since the contact. He was also unable to recall the name of his contact at the casino, but knew that it was a male in the engineering department.

¶ 29    Also attached to the response to the motion for summary judgment was a copy of the NFPA 96 standard, which was a standard for ventilation control and fire protection of commercial cooking operations. NFPA 96, chapter 11.6.2, provided that "[h]oods, grease removal devices, fans, ducts, and other appurtenances shall be cleaned to remove combustible contaminants prior to surfaces becoming heavily contaminated with grease or oily sludge." NFPA 96, chapter 11.6.14, provided that, "[a]fter cleaning or inspection is completed, the exhaust cleaning company and the person performing the work at the location shall provide the owner of the system with a written report that also specifies areas that were inaccessible or not cleaned."

¶ 30    In its reply in support of the motion for summary judgment, Averus claimed that any questions of fact were not material, and that it was not denying the presence of cooking grease in the ductwork at the time of the fire. Averus further claimed that Reisman had opined that Averus had complied with the NFPA 96 standard and plaintiff had not presented any testimony by a qualified expert to challenge that opinion.

¶ 31    The parties came before the trial court for oral argument on the motion for summary judgment on August 7, 2019. On August 12, 2019, plaintiff filed a motion for leave to file a memorandum of supplemental authorities in opposition to the motion for summary judgment, seeking to supplement their briefing by providing several scholarly articles and applicable safety standards. On September 4, 2019, plaintiff also filed a motion for leave to submit a supplemental affidavit in opposition to the motion for summary judgment, seeking to submit the affidavit of Phil Ackland as an expert on the applicable safety standards. Plaintiff noted

that discovery had not yet closed at the time, so Ackland's affidavit should be considered even though it was not originally raised in the summary judgment briefing.

¶ 32    In his affidavit, Ackland averred that he specialized in the investigation of fires in commercial kitchen systems and served on the "NFPA Technical Committee #96 Venting Systems for Commercial Cooking." Ackland opined that the cleaning services performed by Averus violated the standard of care because Averus failed to properly inspect and clean the entire commercial exhaust system, remove all combustible residue, and report in writing any uncleaned or inaccessible areas. Ackland further opined that even if Averus' cleaning had not been postponed after October 19, 2008, the fire still would have occurred, due to the presence of a large quantity of cooking grease located in the portions of the ductwork not cleaned by Averus.

¶ 33    On October 8, 2019, the trial court entered an order granting Averus' motion for summary judgment.[4] The court found that Cantrell averred in his affidavit that Averus contacted plaintiff to schedule a cleaning, but was told that the cleaning needed to be rescheduled due to the renovations, which the court found "serve[d] as specific evidence that Averus attempted to satisfy its duties underneath its contract with [plaintiff], and that [plaintiff] subsequently declined Averus's services." The court noted that plaintiff argued that the evidence showed that Averus cleaned only the accessible portions of the ductwork in violation of NFPA standards and that postponing the cleaning could not have been the cause of the thick accumulations of grease. However, the court found these arguments unpersuasive, finding that "[t]hese contentions contained within the plaintiff's response brief do not precisely address the

---

[4] We note that this was actually a "corrected" opinion; the trial court initially granted summary judgment on September 12, 2019, without discussing Ackland's affidavit.

notion that Averus first contacted [plaintiff] on December 5, 2008, as well as on two other occasions, according to Cantrell's affidavit, prior to the fire occurring on March 20, 2009." Additionally, the court found that plaintiff's response also failed to address the fact that plaintiff continued to make use of the kitchen until January 2009, despite the fact that it was last cleaned on October 19, 2008. The court concluded that "this Court finds the nature and extent of services under the contract between the parties does not belong alongside any reasonable inference [giving rise] to an issue of fact when the record is clear Averus repeatedly volunteered its cleaning services and they were subsequently declined on at least three occasions prior to the March 20, 2009 fire." Consequently, the court found that Averus was entitled to summary judgment on the basis that it had not breached its duty under the parties' contract.

¶ 34    Additionally, the trial court also found that Averus was entitled to summary judgment because there was no question of material fact as to the issue of proximate cause. The court noted that Averus had provided the deposition of Haberzetle, the welder, while plaintiff had attached Ackland's affidavit as to the standard of care, as well as the deposition of Nemecio, the technician, who testified that there were portions of the ductwork that had never been cleaned. The court found that, "[i]n as much as plaintiffs would like for the attached deposition testimony to serve as evidence that there are issues of fact, the testimony from both Ackland and Nemecio respectively does not serve to undercut the notion that any alleged negligence on the part of Averus[ ] only served to furnish a condition[.]" The court further found that plaintiff's evidence "does not serve to undercut Haberzetle's specific assertion that his real concern was welding near grease without the aid of proper safety measures and fire safety equipment." The court also found unpersuasive plaintiff's argument as to the foreseeability of

the fire, finding that "the blanket assertion from plaintiffs['] counsels as to the specific notion that Averus should have recognized the risks of the grease build up, alongside of the ongoing welding, is not enough to overcome the specificity of Haberzetle's testimony in which he testified specifically to the notion that he was concerned as to an actual fire occurring without the proper safety measures and fire safety equipment in place." Accordingly, the trial court found that Averus had shown that it was entitled to judgment as a matter of law as to the issue of proximate cause. This appeal follows.

¶ 35                                                            ANALYSIS

¶ 36        On appeal, plaintiff contends that the trial court erred in granting summary judgment in Averus' favor. A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *XL Specialty Insurance Co. v. Performance Aircraft Leasing, Inc.*, 2019 IL App (1st) 181031, ¶ 62.

¶ 37        "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). The party moving for

summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The movant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 38    In the case at bar, plaintiff claims that the trial court erred in finding that Averus had not breached any duty to plaintiff and any alleged negligence constituted a condition, not a cause, of the fire. The counts directed at Averus in the complaints were based on negligence and on breach of contract. To state a cause of action for negligence, a complaint must set forth facts that establish (1) the existence of a duty of care owed by the defendant to the plaintiff, (2) a breach of that duty, and (3) an injury proximately caused by that breach. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 430 (2006). In order to establish a claim for breach of contract, "a plaintiff must allege and prove the following elements: '(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff.' " *Burkhart v. Wolf Motors of Naperville, Inc.*, 2016 IL App (2d) 151053, ¶ 14 (quoting *Henderson-Smith & Associates, Inc. v. Nahamani Family Service Center, Inc.*, 323 Ill. App. 3d 15, 27 (2001)).

¶ 39     Negligence allegations based on contractual obligations are defined by the subject contract. *St. Paul Mercury Insurance v. Aargus Security Systems, Inc.*, 2013 IL App (1st) 120784, ¶ 60. " 'Where a defendant is charged with negligence because of his failure to perform an act allegedly required by contract, the question of whether the defendant had a duty to perform the act is determined by the terms of the contract itself.' " *St. Paul Mercury Insurance*, 2013 IL App (1st) 120784, ¶ 60 (quoting *Kotarba v. Jamrozik*, 283 Ill. App. 3d 595, 597 (1996)). Accordingly, in the case at bar, the trial court first considered Averus' duties under the contract, and we do the same.

¶ 40     While the parties dispute the extent of Averus' obligations under the contract, the parties do not dispute that there was a contract governing Averus' cleaning of the ductwork, nor do they dispute that Averus last cleaned the kitchen ducts on October 19, 2008. Averus claims that it attempted to schedule additional cleanings, in December 2008 and in March 2009, but its services were declined. The trial court found that, since Averus had attempted to provide its services but was prevented from doing so by plaintiff, plaintiff could not, as a matter of law, establish that Averus had breached its duty under the contract.

¶ 41     A party whose actions preclude performance by the other party may not complain of the second party's nonperformance. *Oakleaf of Illinois v. Oakleaf & Associates, Inc.*, 173 Ill. App. 3d 637, 648 (1988). Where one party can show that the other prevented its performance under the contract, "it is to be taken as prima facie true that he would have accomplished it if he had not been so prevented." *Chicago Title & Trust Co. v. Hedges Manufacturing Co.*, 91 Ill. App. 3d 173, 179 (1980).

¶ 42     In the case at bar, we agree with the trial court that Cantrell's affidavit and deposition testimony provide evidence that Averus attempted to schedule cleanings that were declined by

17

plaintiff, and that plaintiff provided no counteraffidavit or other evidence disputing Cantrell's account, relying only on arguments as to Cantrell's credibility. Thus, we agree with the trial court that there is no question of material fact on this issue.

¶ 43     However, we cannot find that this fact establishes, as a matter of law, that Averus did not breach a duty to plaintiff. Plaintiff does not claim Averus' breach was a result of its failure to clean between October and March. If that was the case, summary judgment would certainly be appropriate, because plaintiff's conduct prevented Averus from performing its duty. Instead, plaintiff claims that the breach occurred in the *way* that Averus was cleaning, namely, cleaning only the accessible areas of the ductwork. It claims that cleaning in this way breached Averus' duties under the contract, because the contract required Averus to clean *all* of the ductwork, even if it was not accessible. In support of this argument, it attached the affidavit of Ackland.[5] Averus, by contrast, claims that it was required to clean only the accessible portions of the ductwork and flag the inaccessible areas to plaintiff, and claims that it complied with those duties. In support of its argument, it attached the deposition transcript of Reisman, among others. Averus' duties under the contract, and its compliance with those duties, give rise to a question of fact that make summary judgment on the issue inappropriate.[6]

¶ 44     This does not end the analysis, however, because the trial court also found that summary judgment was appropriate because Averus' conduct was not a proximate cause of the fire. Our

---

[5] On appeal, Averus claims that the trial court should not have allowed Ackland's affidavit. However, we can find no error in the court's consideration of the affidavit, especially since discovery was still open at the time, and the trial court specifically discussed discovery deadlines with the parties at the hearing on the summary judgment motion, indicating that it contemplated ongoing discovery.

[6] We note that there would also be a causation issue, apart from the condition/cause issue that we discuss below. Specifically, even if plaintiff established that Averus' conduct was the cause of the fire, plaintiff would also need to establish that the fire was caused by the old grease, not by any grease that built up after the last cleaning. This also presents a factual question that cannot be resolved on summary judgment.

supreme court has explained that the term "proximate cause" encompasses two distinct requirements: cause in fact and legal cause. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992). Cause in fact can only be established where there is a reasonable certainty that the defendant's acts caused the injury or damage, meaning that the defendant's conduct was a material element and a substantial factor in bringing about the injury. *Lee*, 152 Ill. 2d at 455. By contrast, legal cause " 'is essentially a question of foreseeability: a negligent act is a proximate cause of an injury if the injury is of a type which a reasonable man would see as a likely result of his conduct.' " *Lee*, 152 Ill. 2d at 456 (quoting *Masotti v. Console*, 195 Ill. App. 3d 838, 845 (1990)). Although the issue of proximate cause is normally a question of fact for a trier of fact to decide, "it is well settled that it may be determined as a matter of law by the court where the facts as alleged show that the plaintiff would never be entitled to recover." *Abrams v. City of Chicago*, 211 Ill. 2d 251, 257-58 (2004).

¶ 45     Our supreme court has recognized a special subset of proximate cause cases involving injuries caused by the intervening acts of third persons. *Abrams*, 211 Ill. 2d at 259. In such a case, courts draw a distinction between a condition and a cause. *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257 (1999). "[I]f the negligence charged does nothing more than furnish a condition by which the injury is made possible, and that condition causes an injury by the subsequent, independent act of a third person, the creation of the condition is not the proximate cause of the injury." *Galman*, 188 Ill. 2d at 257. Our supreme court has instructed that "[t]he test that should be applied in all proximate cause cases is whether the first wrongdoer reasonably might have anticipated the intervening efficient cause as a natural and probable result of the first party's own negligence." *Galman*, 188 Ill. 2d at 257.

¶ 46    In *Galman*, a trucker illegally parked a tanker truck on the side of a street, in an area in which parking was permitted at other times, and 41 feet from an intersection. *Galman*, 188 Ill. 2d at 254. Shortly after he parked, an 18-year-old student crossed the street in front of the truck, despite the presence of a marked crosswalk at the intersection. *Galman*, 188 Ill. 2d at 254. While she was crossing the street, she was struck by another vehicle and died from her injuries. *Galman*, 188 Ill. 2d at 255. The decedent's estate sued the trucker and his company, claiming that the illegally parked truck caused her death. *Galman*, 188 Ill. 2d at 255. The supreme court found that, while the trucker's conduct was a cause in fact of the injury—if he had not parked there, the decedent's injuries "almost certainly would not have occurred"—his conduct was not the legal cause of the injury. *Galman*, 188 Ill. 2d at 260-61.

¶ 47    In its analysis, the supreme court considered whether the injury was "of a type that a reasonable person would see *as a likely result* of his or her conduct." (Emphasis in original.) *Galman*, 188 Ill. 2d at 260. The court noted that the decedent's estate claimed that it was foreseeable that at school closing time, school children might be crossing the street and drivers might need both lanes of traffic to avoid an accident, and further noted that it had "no quarrel" with this assertion. *Galman*, 188 Ill. 2d at 260. The court, however, found that this did not properly frame the issue:

"That, however, is not the question. The question is whether it was reasonably foreseeable that violating a 'no parking' sign at mid-block would likely result in a pedestrian's ignoring a marked crosswalk at the corner, walking to mid-block, and attempting to cross a designated truck route blindly and in clear violation of the law. Clearly, it would not. [The decedent's] decision to jaywalk, while undeniably tragic and regrettable, was entirely of her own making. [The truck driver] neither caused [the

decedent] to make that decision, nor reasonably could have anticipated that decision as a likely consequence of their conduct. One simply does not follow from the other." *Galman*, 188 Ill. 2d at 260-61.

¶ 48    The supreme court reached the same result in *Abrams*. In that case, the plaintiff called 911 twice after going into labor, requesting an ambulance to take her to the hospital. *Abrams*, 211 Ill. 2d at 253-54. Both times, the dispatcher indicated that the situation was not an emergency, and the second dispatcher gave the number of a private ambulance service. *Abrams*, 211 Ill. 2d at 254. A private ambulance was not available, so the plaintiff asked a friend to drive her to the hospital. *Abrams*, 211 Ill. 2d at 254-55. While crossing one intersection, the plaintiff's friend drove through a red light, holding down her horn. *Abrams*, 211 Ill. 2d at 255. In the intersection, the vehicle collided with a vehicle driven by an individual who was speeding, driving under the influence, and driving on a suspended license. *Abrams*, 211 Ill. 2d at 255. The plaintiff sued the city, claiming that its failure to provide ambulance service had caused her injuries. *Abrams*, 211 Ill. 2d at 255.

¶ 49    The *Abrams* court found that, as in *Galman*, the plaintiff could not establish that the city's conduct was a proximate cause of her injuries. The court found that, as a matter of law, "the City could *not* have reasonably anticipated that a refusal to send an ambulance when labor pains are 10 minutes apart would likely result in plaintiff's driver running a red light at the same time that a substance-impaired driver was speeding through the intersection on a suspended license." (Emphasis in original.) *Abrams*, 211 Ill. 2d at 261-62. The court continued:

    "While all traffic accidents are to some extent remotely foreseeable [citation], this is not the kind of harm that was sufficiently foreseeable from the refusal to send an ambulance so as to satisfy the 'legal cause' portion of a proximate cause analysis. In

other words, the injury was not of a type a reasonable person would see as the *likely or probable result* of the refusal to send an ambulance. [Citations.] Instead, the City's conduct simply furnished a condition, making possible the injury caused by the independent, illegal acts of others. Plaintiff was endangered by the acts of [the two drivers], not by the City." (Emphasis in original.) *Abrams*, 211 Ill. 2d at 262.

¶ 50    In the case at bar, we agree with the trial court that Averus' conduct was not the legal cause of the fire but merely created a serious condition to exist. If Averus was negligent in not cleaning the inaccessible areas of the ductwork, the independent acts of other actors served as the legal cause of the injury. It was not reasonably foreseeable that an individual would observe grease present in a duct and nevertheless proceed to apply fire to that duct, in the form of welding, in the absence of any fire prevention equipment whatsoever and despite expressly acknowledging, both at the time and in deposition testimony, that such work was dangerous. It was also not reasonably foreseeable that plaintiff would decline Averus' cleaning services, continue to use the kitchen (and its ducts) for nearly three months after the last cleaning, and expect that same ductwork to be used in renovations.

¶ 51    Plaintiff claims that this case is analogous to *Flynn v. Town of Normal*, 2018 IL App (4th) 170070, where the Fourth District rejected the claim that the town's conduct was merely a condition. In that case, the plaintiff was driving an automobile on a two-lane bridge, known as the " 'Camelback Bridge' " due to its "distinctive 'humped configuration,' " when he drove over the top of the bridge's " 'hump[ ]' " and observed that the vehicle in front of him was stopped in traffic. *Flynn*, 2018 IL App (4th) 170070, ¶ 4. He attempted to stop his vehicle, but was unable to do so, rear-ending the vehicle in front of him. *Flynn*, 2018 IL App (4th) 170070, ¶ 4. He exited his vehicle and stepped between the two vehicles to inspect for damage. *Flynn*,

2018 IL App (4th) 170070, ¶ 4. A third vehicle then drove over the bridge's "hump" and struck the plaintiff's vehicle, propelling it into plaintiff and injuring him. *Flynn*, 2018 IL App (4th) 170070, ¶ 4. The plaintiff sued the town, claiming that the severe crest of the bridge and too-high speed limit, combined with the lack of any warning signs, caused the injury. *Flynn*, 2018 IL App (4th) 170070, ¶ 4. The town claimed that it merely furnished a condition and that any injury was the result of intervening acts of third parties. *Flynn*, 2018 IL App (4th) 170070, ¶ 46.

¶ 52    On appeal, the Fourth District found that a question of fact existed as to whether the plaintiff's injury would have occurred if traffic-control measures had been present. *Flynn*, 2018 IL App (4th) 170070, ¶ 51. Additionally, the court found that the injury was reasonably foreseeable by the town and that the town could reasonably anticipate that, "without measures to reduce speeds across a bridge that had an impaired stopping sight distance, motorists would be unaware of the danger posed and fail to reduce their speeds in order to avoid obstacles in the roadway." *Flynn*, 2018 IL App (4th) 170070, ¶ 52. The court further found that the town "could reasonably have anticipated that a motorist involved in a collision on the bridge might have to exit their vehicle for various reasons, including to check on the well-being of another driver, as was [the plaintiff's] purported reasoning in the instant case." *Flynn*, 2018 IL App (4th) 170070, ¶ 53.

¶ 53    We find *Flynn* to be entirely inapposite to the instant case. As the *Flynn* court recognized, our supreme court has instructed that "[t]he test that should be applied in all proximate cause cases is whether the first wrongdoer reasonably might have anticipated the intervening efficient cause as a natural and probable result of the first party's own negligence." *Galman*, 188 Ill. 2d at 257; see *Flynn*, 2018 IL App (4th) 170070, ¶ 53 (quoting *Galman*, 188 Ill. 2d at 257). In the

case at bar, unlike the town in *Flynn*, Averus would have no reason to anticipate that a welder would attempt to weld the kitchen ducts where he observed grease, had no fire protection equipment, and knew that doing so was dangerous. While a defendant need not be able to foresee the specific harm that would occur (see *Coleman v. Provena Hospitals*, 2018 IL App (2d) 170313, ¶ 25), the proximate-cause analysis nevertheless asks "whether the intervening efficient cause was of a type that a reasonable person would see as a likely result of his or her conduct" (*Galman*, 188 Ill. 2d at 259). Here, Haberzetle's conduct—and plaintiff's conduct in continuing to use the kitchen—was not of the type that a reasonable person would foresee as a likely result of any conduct on Averus' part, and, consequently, the trial court properly found that plaintiff is unable to establish proximate cause as a matter of law.

¶ 54                                                    CONCLUSION

¶ 55        For the reasons set forth above, we find that the trial court properly entered summary judgment in favor of Averus where plaintiff is unable to establish proximate cause as a matter of law.

¶ 56        Affirmed.

No. 1-19-2071

| | |
|---|---|
| **Cite as:** | *Empress Casino Joliet Corp. v. Averus, Inc.*, 2020 IL App (1st) 192071 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2017 L 008305; the Hon. James N. O'Hara, Judge, presiding. |
| **Attorneys for Appellant:** | Mark A. Rabinowitz and Kevin P. Caraher, of Cozen O'Connor, PC, of Chicago, for appellants Empress Casino Joliet Corporation and National Fire and Marine Insurance Company.<br><br>David E. Walker and Douglas W. Walker, of Walker Wilcox Matousek LLP, of Chicago, for appellant Lloyd's Syndicate 1414 (Managed by Ascot Underwriting, Ltd.).<br><br>Samuel Pace and Randy Greene, of Dugan, Brinkmann, Maginnis & Pace, of Philadelphia, for appellant Axis Insurance Company.<br><br>Thomas A. McDonald, of McDonald Law Firm, LLC, of Chicago, for appellant Axis Insurance Company. |
| **Attorneys for Appellee:** | Dan L. Boho, Gretchen Harris Sperry, and Anne C. Couyoumjian, of Hinshaw & Culbertson LLP, of Chicago, for appellee Averus, Inc. |